UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

"IN ADMIRALTY"

| | | |
|---|---|---|
| PRAXIS ENERGY AGENTS, LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CASE NO. |
| | § | |
| M/V CARIBBEAN JADE, her equipment, | § | |
| engines, appurtenances, and freights, etc. | § | |
| *in rem* | § | |
| | § | |
| Defendant. | § | |

*EMERGENCY!*

## VERIFIED ORIGINAL COMPLAINT

Plaintiff, Praxis Energy Agents, LLC ("Plaintiff" or "Praxis"), files this its Verified Original Complaint against Defendant, M/V CARIBBEAN JADE (the "Vessel") *in rem*, and, upon information and belief, alleges as follows:

### JURISDICTION AND VENUE

1.      This is a case of admiralty jurisdiction, 28 U.S.C. § 1333, as hereinafter more fully appears.  This is an admiralty or maritime claim within the meaning of Federal Rule of Civil Procedure 9(h) and is brought pursuant to Supplemental Rule C.

2.      Venue is proper in this Court because the Vessel is or will be within this District and Division during the pendency of this lawsuit.

### THE PARTIES

3.      At all material times to this action, Plaintiff was and still is a limited liability company or other business entity organized and existing under the laws of the State of New Jersey, and was engaged in the supply of bunker fuels, lubricants, and/or related services to vessels calling at the Port of Miami and surrounding areas.

1919201-1

4.      Defendant M/V CARIBBEAN JADE was and still is a vessel bearing IMO No. 9160504, with gross tonnage of 4,028, and sailing under the flag of Antigua and Barbuda.  At the time of the events giving rise to Plaintiff's claim, the M/V CARIBBEAN JADE was owned by Olympic Chartering, Ltd. and operated/managed by Bernuth Agencies, Inc. ("Bernuth").[1]  The M/V CARIBBEAN JADE is at the time of the filing of the Verified Original Complaint and/or will be during the pendency of this action within the navigable waters of this District and Division and within the jurisdiction of this Court.

## THE FACTS

5.      On or about April 18, 2012, pursuant to an order received from Bernuth, the Vessel's operator/manager and agent, Praxis delivered to the M/V CARIBBEAN JADE a supply of 140.230 MT of IFO-180 (HS) (RME 180) bunker fuel, which was necessary for the Vessel's operation.[2]

6.      In agreeing to provide the aforementioned goods and services to the M/V CARIBBEAN JADE, Praxis relied upon the credit of the Vessel.

7.      On or about April 20, 2012, Praxis sent an invoice (the "Invoice") for the total cost of the goods and services described above, specifically $111,975.98, to Bernuth as agents of the owner of the M/V CARIBBEAN JADE.[3]  The Invoice demanded payment within 25 days from the delivery date.[4]

---

[1]      *See* Equasis Ownership and Management History for M/V CARIBBEAN JADE, attached hereto as Exhibit A; *see also* Settlement Agreement/Payment Schedule between Praxis and Bernuth, attached hereto as Exhibit B.

[2]      The goods and services provided by Praxis are fully described and itemized in Bunker Nomination No. 11708, Bunker Certificate No. 005402, and Invoice No. 11708, which are attached hereto as Exhibits C, D, and E.  Additionally, the agreement concerning the supply of these goods and services incorporated and was subject to Plaintiff's Standard Terms and Conditions, a copy of which is attached hereto as Exhibit F.

[3]      *See* Exhibit E.

[4]      *See id.*

8.      Despite the passage of more than 25 days following Plaintiff's full performance of its obligation to provide goods and services to the Vessel, and despite due demand, Praxis did not receive payment for the goods and services evidenced in the Invoice.

9.      On July 9, 2012, Bernuth agreed to a payment schedule regarding the considerably past-due Invoice.[5] According to the terms of the payment schedule, Bernuth was to submit payment of $120,560.81 to Praxis on or before August 22, 2012.[6] Bernuth failed to issue payment before the expiration of the deadline, and Praxis subsequently submitted notice of nonpayment to Bernuth.[7] To date, Praxis has received no payment for the necessaries referenced in the Invoice, which Praxis supplied to the M/V CARIBBEAN JADE nearly 5 months ago.

10.     On the basis of the foregoing, Praxis currently possesses a total claim against the M/V CARIBBEAN JADE in the amount of $119,366.39, plus the costs, attorney's fees, and interest that has accrued and/or will accrue in the future.

## RULE C ALLEGATIONS

11.     The goods and services supplied to the M/V CARIBBEAN JADE constitute necessaries under within the meaning of 46 U.S.C. § 31342.

12.     As a supplier of necessaries to the M/V CARIBBEAN JADE on the order of her managers/operators, Praxis is the holder of a maritime lien against the Vessel, pursuant to 46 U.S.C. § 31341, *et seq.*, for all amounts owed to it including interest, costs, and attorney's fees.

13.     Praxis seeks an Order from this Court directing the Clerk of this Court to issue a Warrant of Arrest for the M/V CARIBBEAN JADE, commanding the United States Marshal for the Southern District of Florida to seize the Vessel, and further seeks that the Vessel thereafter be sold at

---

5       *See* Exhibit B.

6       *See id.* The sum ($119,366.39) accounted for the agreed 2% monthly interest rate described in Plaintiff's Standard Terms and Conditions and the Invoice.

judicial sale, the proceeds thereof to be deposited into the registry of the Court and, after due proceedings are had, to be disbursed to Praxis in satisfaction of the debt owed to it.

14.     All and singular of the premises are true and within the admiralty jurisdiction of the United States of America and of this Court.

WHEREFORE, Plaintiff prays:

a.     That process in due form of law, according to the practice of this Court in cases of admiralty jurisdiction issue against the M/V CARIBBEAN JADE, her engines, tackle, apparel, etc., *in rem*, and that all persons claiming any title or right to the Vessel be cited to appear and answer under oath the allegations of this Verified Original Complaint;

b.     That a judgment be entered in favor of Plaintiff against the M/V CARIBBEAN JADE in the approximate amount of $120,560.81, together with interest, costs of suit, and attorney's fees;

c.     That the M/V CARIBBEAN JADE, her engines, tackle, apparel, etc. be condemned and sold, free and clear of all liens and encumbrances, to satisfy the judgment against the M/V CARIBBEAN JADE and that this Court award Plaintiff out of the proceeds of said sale the full amount of its damages, together with interest, costs of suit, and attorney's fees; and

d.     That this Court grant Plaintiff such other and further relief as may be just and proper.

---

7     Over six (6) calendar days have passed since Praxis submitted notice of nonpayment.

Respectfully submitted,

/s/ Hector V. Ramirez
Hector V. Ramirez
Florida Bar No. 0484857
HAMILTON, MILLER & BIRTHISEL, LLP
150 Southeast Second Avenue, Suite 1200
Miami, Florida 33131
Telephone:  (305) 379-3686
Facsimile:   (305) 379-3690
hramirez@hamiltonmillerlaw.com

ATTORNEYS FOR PLAINTIFF
PRAXIS ENERGY AGENTS, LLC

OF COUNSEL:

Dimitri P. Georgantas
Eugene W. Barr
CHAFFE MCCALL, LLP
801 Travis Street, Suite 1910
Houston, Texas 77002
Telephone:  (713) 546-9800
Facsimile:   (713) 546-9806
georgantas@chaffe.com
barr@chaffe.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

"IN ADMIRALTY"

| | | |
|---|---|---|
| PRAXIS ENERGY AGENTS, LLC | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CASE NO. |
| | § | |
| M/V CARIBBEAN JADE, her equipment, | § | |
| engines, appurtenances, and freights, etc. | § | |
| *in rem* | § | |
| | § | |
| | § | |
| Defendant. | § | |

## VERIFICATION

BEFORE ME, the undersigned authority, on this day personally appeared Hector V. Ramirez, who being duly sworn, deposed and stated as follows:

"I am an attorney for Plaintiff, Praxis Energy Agents, LLC, in connection with the referenced matter. I have read the foregoing Verified Original Complaint and know the contents thereof and that the same are true and correct to the best of my knowledge, information and belief, based upon documentation and information provided to me by Plaintiff. The reason that I make this verification instead of Plaintiff is that Plaintiff does not have an officer or director within this District."

_____
Hector V. Ramirez

STATE OF FLORIDA          )
                          ) SS:
COUNTY OF MIAMI-DADE      )

SWORN To and subscribed before me this 6th day of September, 2012, by HECTOR V. RAMIREZ, who is personally known to me.

Notary Public
Commission Number:
Notary Seal

NOTARY PUBLIC-STATE OF FLORIDA
Jerry D. Hamilton
Commission # DD891815
Expires: JUNE 01, 2013
BONDED THRU ATLANTIC BONDING CO, INC.

1919242-1

# EXHIBIT A



# Equasis - Ship folder
# CARIBBEAN JADE
*imo: 9160504*

## • Disclaimers

Neither Equasis nor its officers or employees shall be under any liability or responsibility whatsoever regarding the data displayed on this site, including hyperlinks or printing. Whist Equasis will make every effort to provide accurate information, it does not rule out the possibility of inadvertent omissions or inaccuracies.

Neither Equasis nor its officers or employees accept any responsibility and shall not be liable for any loss to any person caused by or arising from any information displayed on this site.

Only factual information is displayed in Equasis. Information does not undergo any changes by Equasis. Special attention has been paid to the accuracy of the data. Data is regularly updated in order to help ensure that information remains as reliable as possible. The frequency of updates varies from provider to provider.

No part of the information contained in or from the Equasis website may be stored in a retrieval system, or transmitted in any form, or by any means without prior permission in writing from Equasis.

The following actions are forbidden:
- • Bulk-downloading of data contained on the site ;
- • Use of downloaded data for financial gain ;
- • Use of a robot or similar remote device to download large batches of data.

The above list is not exhaustive, and it should be noted that Equasis continually monitors the activity on its website and if misuse is detected, then the user's account can be locked without prior notice.

# Ship informations

### • Ship particulars

| | Information | Since |
|---|---|---|
| IMO number : | 9160504 | |
| Name of ship : | CARIBBEAN JADE | (since 01-03-2007) |
| Call sign : | V2PM3 | |
| MMSI : | 304332000 | |
| Gross tonnage : | 4028 | (since 01-06-2000) |
| DWT : | 5110 | |
| Type of ship : | Container Ship | (during 1998) |
| Year of build : | 1997 | |
| Flag : | Antigua and Barbuda | (since 01-01-1998) |
| Status of ship : | In Service/Commission | (since 27-02-2010) |
| Last update : | 14/08/2012 | |

## • Management detail

| IMO | Role | Name of company | Address | Date of effect |
|-----|------|-----------------|---------|----------------|
| 5065670 | ISM Manager | MERCATOR SHIPMANAGEMENT SA | Panama City, Panama. | since 29-08-2010 |
| 0772961 | Ship manager | BERNUTH AGENCIES INC | 3201, NW 24th Street Road, Miami FL 33142-6913, USA. | since 01-10-2007 |
| 5297087 | Registered owner | OLYMPIC CHARTERING LTD | Care of Bernuth Agencies Inc , 3201, NW 24th Street Road, Miami FL 33142-6913, USA. | since 01-03-2007 |

## • Classification status

| Classification society | Date change status | Status | Reason |
|------------------------|--------------------|--------|--------|
| Germanischer Lloyd | since 13-09-2011 | Reinstated | |

## • Classification surveys

| Classification society | Date survey | Date next survey |
|------------------------|-------------|------------------|
| Germanischer Lloyd | 18/01/2008 | 31/10/2012 |

## • Safety management certificate

| Classification society | Date survey | Date expiry | Date of status | Status | Reason | Type |
|------------------------|-------------|-------------|----------------|--------|--------|------|
| Germanischer Lloyd | 29/08/2010 | 12/09/2012 | 23/10/2010 | Delivered | | Statutory |
| Germanischer Lloyd | 13/09/2007 | 12/09/2012 | 23/10/2007 | Delivered | | Statutory |

## • P&I information

| Name of P&I insurer | Recorded on |
|---------------------|-------------|
| American Steamship Owner P&I association | 20/02/2012 |

# Ship inspections

## • List of port state control

| PSC organisation | Authority | Port of inspection | Date of report | Detention | Duration (days) | Number of deficiencies |
|---|---|---|---|---|---|---|
| US Coast Guard | United States of America | Miami, Florida | 05/05/2012 | Y | 79 | 1 |
| US Coast Guard | United States of America | Miami, Florida | 02/10/2011 | N | 0 | 3 |
| US Coast Guard | United States of America | Tampa, Florida | 29/07/2010 | N | 0 | 1 |
| US Coast Guard | United States of America | Miami, Florida | 12/01/2010 | N | 0 | 1 |
| US Coast Guard | United States of America | Miami, Florida | 01/05/2009 | N | 0 | 1 |
| US Coast Guard | United States of America | Miami, Florida | 11/04/2008 | N | 0 | 3 |
| US Coast Guard | United States of America | Miami, Florida | 31/08/2007 | N | 0 | 0 |
| US Coast Guard | United States of America | Miami, Florida | 05/04/2007 | N | 0 | 0 |
| US Coast Guard | United States of America | Miami, Florida | 08/11/2006 | N | 0 | 0 |
| US Coast Guard | United States of America | Miami, Florida | 07/08/2006 | N | 0 | 0 |
| US Coast Guard | United States of America | Miami, Florida | 01/03/2006 | N | 0 | 1 |
| US Coast Guard | United States of America | Jacksonville, Florida | 23/01/2006 | N | 0 | 0 |
| US Coast Guard | United States of America | Jacksonville, Florida | 18/01/2006 | N | 0 | 0 |
| US Coast Guard | United States of America | Jacksonville, Florida | 19/12/2005 | N | 0 | 0 |

• List of port state control

| PSC organisation | Authority | Port of inspection | Date of report | Detention | Duration (days) | Number of deficiencies |
|---|---|---|---|---|---|---|
| US Coast Guard | United States of America | Miami, Florida | 26/09/2005 | N | 0 | 0 |
| US Coast Guard | United States of America | Jacksonville, Florida | 15/03/2005 | N | 0 | 3 |
| US Coast Guard | United States of America | MSO Jacksonville | 31/01/2004 | N | 0 | 0 |
| US Coast Guard | United States of America | MSO Jacksonville | 15/10/2003 | N | 0 | 0 |
| US Coast Guard | United States of America | Jacksonville, Florida | 11/09/2003 | Y | 21 | 4 |
| US Coast Guard | United States of America | MSO Jacksonville | 10/09/2003 | N | 0 | 2 |
| US Coast Guard | United States of America | Jacksonville, Florida | 29/07/2003 | Y | 1 | 4 |
| US Coast Guard | United States of America | MSO Miami | 24/01/2003 | N | 0 | 1 |
| US Coast Guard | United States of America | MSO Jacksonville | 14/09/2002 | N | 0 | 0 |
| US Coast Guard | United States of America | Jacksonville, Florida | 24/07/2002 | Y | 1 | 3 |
| US Coast Guard | United States of America | MSO Jacksonville | 16/02/2002 | N | 0 | 0 |
| US Coast Guard | United States of America | MSO Jacksonville | 16/01/2002 | N | 0 | 4 |

• Human element deficiencies

| PSC organisation | Authority | Port of inspection | Date of report | Human element deficiencies |
|---|---|---|---|---|
| US Coast Guard | United States of America | Miami, Florida | 01/05/2009 | 1 |

• **Human element deficiencies**

| PSC organisation | Authority | Port of inspection | Date of report | Human element deficiencies |
|---|---|---|---|---|
| US Coast Guard | United States of America | Miami, Florida | 11/04/2008 | 1 |
| US Coast Guard | United States of America | Jacksonville, Florida | 15/03/2005 | 2 |
| US Coast Guard | United States of America | Jacksonville, Florida | 11/09/2003 | 1 |
| US Coast Guard | United States of America | MSO Jacksonville | 10/09/2003 | 1 |
| US Coast Guard | United States of America | MSO Jacksonville | 16/01/2002 | 2 |

## Ship history

### • Current and former name(s)

| Name of ship | Date of effect | Source |
|---|---|---|
| CARIBBEAN JADE | since 01-03-2007 | IHS Fairplay (LRF) |
| Jade | since 01-04-2005 | IHS Fairplay (LRF) |
| Mexico Express | since 01-04-2002 | IHS Fairplay (LRF) |
| Jade | since 01-08-2000 | IHS Fairplay (LRF) |

### • Current and former flag(s)

| Flag | Date of effect | Source |
|---|---|---|
| Antigua and Barbuda | since 01-01-1998 | IHS Fairplay (LRF) |

### • Current and former classification status

| Classification society | Date of survey | Sources |
|---|---|---|
| Germanischer Lloyd | 18/01/2008 | Germanischer Lloyd |
| Germanischer Lloyd | 19/11/2002 | Germanischer Lloyd |

### • Company

| Company | Role | Date of effect | Sources |
|---|---|---|---|
| MERCATOR SHIPMANAGEMENT SA | ISM Manager | since 29-08-2010 | IHS Fairplay (LRF) |
| UNKNOWN | ISM Manager | since 01-10-2007 | IHS Fairplay (LRF) |

• **Company**

| Company | Role | Date of effect | Sources |
|---|---|---|---|
| BERNUTH AGENCIES INC | Ship manager | since 01-10-2007 | IHS Fairplay (LRF) |
| MERCATOR SHIPMANAGEMENT SA | ISM Manager | since 13-09-2007 | IHS Fairplay (LRF) |
| UNKNOWN | ISM Manager | since 01-04-2007 | IHS Fairplay (LRF) |
| MERCATOR SHIPMANAGEMENT SA | Ship manager | since 01-03-2007 | IHS Fairplay (LRF) |
| OLYMPIC CHARTERING LTD | Registered owner | since 01-03-2007 | IHS Fairplay (LRF) |
| MARCONSULT SCHIFFAHRT GMBH | ISM Manager | since 13-11-2003 | IHS Fairplay (LRF) |
| MARCONSULT SCHIFFAHRT GMBH | Ship manager | since 01-06-2003 | IHS Fairplay (LRF) |
| THODE GMBH & CO KG | ISM Manager | since 24-04-2002 | IHS Fairplay (LRF) |
| THODE GMBH & CO KG | Ship manager | during 07-2001 | IHS Fairplay (LRF) |
| MARCONSULT SCHIFFAHRTSKONTOR | Ship manager | during 2000 | IHS Fairplay (LRF) |
| JADE | Registered owner | since 01-01-2000 | IHS Fairplay (LRF) |

EXHIBIT B

## SETTLEMENT AGREEMENT/PAYMENT SCHEDULE

WHEREAS, Praxis Energy Agents, LLC (hereinafter referred to as "Praxis") is a company based in New Jersey and is a worldwide seller/supplier of bunker fuels for ocean going vessels;

WHEREAS, Bernuth Agencies, Inc. (hereinafter referred to as "Bernuth") is a vessel operator engaged in the operation/management of ocean going vessels, including, but not limited to the M/V CARIBE LEGEND, M/V FRANKLIN STRAIT, M/V CARIBBEAN JADE, and M/V MICHAEL J;

WHEREAS, at the request of Bernuth, Praxis has supplied the above named vessels with bunkers, pursuant to the general terms and conditions of Praxis;

WHEREAS, as a result of the aforementioned supplies, Praxis has generated invoices which are now considerably past due, demand for payment has been made , but they remain outstanding;

WHEREAS, Bernuth has expressed that it is experiencing financial difficulties due to reported market conditions; and

WHEREAS, Praxis and Bernuth have discussed the situation, both directly between them, as well as through counsel, and have now agreed to a payment schedule, as will be set forth below.

NOW, therefore, for premises considered and for valuable consideration, Praxis and Bernuth hereby agree to the following payment schedule of the outstanding invoices of Praxis, inclusive of applicable interest at 2% per month:

      July 11, 2012 - $120,994.13 - Invoice 11505
      July 18, 2012 - $121,504.20 - Invoice 11606
      July 25, 2012 - $102,053.48 - Invoice 11607

1890104-1

August 1, 2012 - $91,348.01 - Invoice 11654 Part I
August 8, 2012 - $91,751.42 - Invoice 11654 Part II
August 15, 2012 - $119,750.20 - Invoice 11655
August 22 2012 - $119,366.39 - Invoice 11708
August 29, 2012 - $114,389.14 - Invoice 11844
September 5, 2012 - $111,273.24 – Invoice 11867
September 12, 2012 - $108,001.95 - Invoice 11928

Late charges shall be included with every principal payment;

In case of non-payment of any the invoices as designated above, notice will be given and Bernuth will have six (6) calendar days maximum grace period to settle payment.

Any failure to make a payment will result in Praxis taking any and all necessary legal action for all the remaining outstanding past due invoices, and by entering into this Settlement Agreement/Payment Schedule, Praxis does not waive any of its rights, save for the agreements made herein.  It is further agreed that in the event that Praxis initiates legal action against Bernuth, the prevailing party will be entitled to recovery of reasonable legal fees and related litigation costs.

Praxis and Bernuth further agree that all transactions to date and/or in the future between Praxis and Bernuth, including, but not limited to, any disputes arising out of this Settlement Agreement/Payment Schedule will be governed by U.S. general maritime law, as per the General Terms and Conditions of Praxis.

For the same consideration, Praxis and Bernuth further agree that any and all unpaid invoices from Praxis to Bernuth, including but not limited to, the invoices referenced in this Settlement Agreement/Payment Schedule, shall immediately be considered overdue and payable, upon the occurrence of any of the following events:

(i)     Any vessel owned or operated by Bernuth is arrested or attached by a third party for unpaid debts; or

1890104-1                                    2

(ii)    There is a change in the financial circumstances or structural organization of Bernuth sufficient to cause Praxis to reasonably believe that its likelihood of receiving payment from Bernuth is jeopardized or that its security interest in any of Bernuth owned or operated vessels is jeopardized;

(iii)   Bernuth files for bankruptcy protection.

EXECUTED at _MIAMI_____, __FL_____, this _9th_ day of July, 2012.

BERNUTH AGENCIES, INC.

By: _____

Title: _PRESIDENT_____

Printed Name: _JORDAN MONOCANDILOS_____

## AFFIDAVIT

BEFORE ME, the undersigned authority, on this day personally appeared Jordan Monocandilos the person whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the free and voluntary act of Bernuth Agencies, Inc., and that he did execute the same for the purpose and consideration therein expressed, and in the capacity therein stated, and that he thereunto was duly authorized.

SUBSCRIBED AND SWORN before me on this _9th_ of July, 2012.

_____
Notary Public



1890104-1                                                                 3

PRAXIS ENERGY AGENTS, LLC

By: _____

Title: _Executive Director_

Printed Name: _Daniel A. Yesosky_

## AFFIDAVIT

BEFORE ME, the undersigned authority, on this day personally appeared _Daniel A. Yesosky_ the person whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the free and voluntary act of Praxis Energy Agents, LLC, and that he did execute the same for the purpose and consideration therein expressed, and in the capacity therein stated, and that he thereunto was duly authorized.

SUBSCRIBED AND SWORN before me on this _10th_ of July, 2012.

_____
Notary Public

MORGAN C BROWN IV
Notary Public
Connecticut
My Commission Expires Feb 28, 2016

1890104-1                                    4

EXHIBIT C



Worldwide Marine Oil Suppliers

263 Tresser Blvd, Suite 10-15
Stamford, CT  06901, USA
TEL: 203.357.9700   EMAIL: NEWYORK@PRAXISENERGYAGENTS.COM

## BUNKER NOMINATION

CONTRACT NUMBER:   11708

**CONTRACT DATE:**   18 April 2012

| | |
|---|---|
| **BUYER:** | **TO:** BERNUTH AGENCIES INC. |
| M/V CARIBBEAN JADE (IMO: 9160504) | **ATTENTION:** DEBI DELGADO |
| AND/OR OLYMPIC CHARTERING LTD. | **PREPARED BY:** JOHN VASSILAKOS |
| AND/OR MASTER AND/OR OWNER AND/OR | |
| MANAGERS AND/OR OPERATORS | |
| AND/OR BERNUTH AGENCIES INC. | |
| 3201 N.W. 24 STREET/RD | |
| MIAMI, FL 33142 | |
| UNITED STATES | |

ACTING AS CONTRCUTUAL 'SELLERS' AND IN ACCORDANCE WITH THE INSTRUCTIONS RECEIVED FROM THE PURCHASER, "M/V CARIBBEAN JADE (IMO: 9160504)" AND OWNERS, WE CONFIRM THE FOLLOWING BUNKER STEM. THIS TRANSACTION IS COVERED BY OUR STANDARD TERMS AND CONDITIONS, A COPY OF WHICH IS IN YOUR POSSESSION. IF YOU HAVE NOT RECEIVED A COPY, ONE IS AVAILABLE IMMEDIATELY UPON REQUEST OR VIA OUR WEBPAGE AT HTTP://WWW.PRAXISENERGYAGENTS.COM. THE ACCEPTANCE OF MARINE FUELS, LUBRICANTS AND/OR SUPPLIES BY THE NOMINATED VESSEL SHALL BE DEEMED TO CONSTITUTE THE CLEAR ACCEPTANCE OF OUR STANDARD TERMS AND CONDITIONS, WHICH INCLUDE EXPRESSLY SELLER'S MARITIME LIEN RIGHTS.

| | |
|---|---|
| **SELLER / SUPPLIER:** | PRAXIS ENERGY AGENTS, LLC |
| **BDR / BARGE OPERATOR:** | TRANSMONTAIGNE PRODUCT SERVICES INC |
| **VESSEL NAME:** | M/V CARIBBEAN JADE (IMO: 9160504) |
| **PORT OF DELIVERY:** | MIAMI |
| **DELIVERY DATE:** | 20 April 2012 (0400 HRS) |
| **EXTRA CHARGES:** | OVERTIME, TAXES, PORT & TERMINAL DUES., FOR BUYERS' ACCOUNT IF INCURRED |
| **OBSERVERS:** | OPERATIONS TO BE WITNESSED BY THE VESSEL'S REPRESENTATIVE. |
| **AGENTS:** | BERNUTH AGENCY |
| **TERMS OF PAYMENT:** | WITHIN 25 DAYS DUE NET FROM DATE OF DELIVERY VIA WIRE TRANSFER AGAINST ORIGINAL INVOICE AND DELIVERY RECEIPT(S) |

| Product ID / Description | Quantity / UOM | Net Price / Qty |
|---|---|---|
| IFO-180 (HS) (RME 180) | 144.000 MT | USD 798.00 / MT |
| OIL SPILL (0.08 /GBBL) | | USD 73.74 |

*THIS NOMINATION/DELIVERY IS SUBJECT TO RECEIVING MINIMUM $160,000 PAYMENT TOWARDS PAST DUE INVOICES BY APRIL 19*

1. ALL TRUCK DELIVERIES ARE PLACED SUBJECT TO TRUCK ACCESSIBILITY, VESSEL MUST STAY BERTHED IN ORDER TO RECEIVE THE FUEL BY TRUCKS;
2. MEASUREMENTS OF THE BARGE'S TANKS SHOULD BE TAKEN PRIOR AND AFTER THE BUNKERING OPERATION, AND THE FIGURES OBTAINED THEREIN SHALL BE THE ONLY ONES TO BIND ALL PARTIES FOR THE FINAL DETERMINATION OF QUANTITY DISPUTES;
3. DURING BUNKERING OPERATION, NO LESS THAN ONE SEALED REPRESENTATIVE SAMPLE CAN BE TAKEN IN COMPLIANCE WITH THE MARPOL ANNEX VI GUIDELINES; AS LONG AS THEY DO NOT DEFY SAFETY PROCEDURES OR THE PHYSICAL SUPPLIER'S PRACTICING STANDARDS.
4. QUALITY SPECIFICATIONS TO BE IN ACCORDANCE WITH THE INTERNATIONAL STANDARDS AS THOSE SET BY THE INTERNATIONAL STANDARDIZATION ORGANIZATION ISO 8217/2005 (E) AND THE LATEST REGULATIONS OF THE MARPOL ANNEX VI.

E&OE

EXHIBIT D

04/23/2012 07:37 9543554244 PAGE 09/21

# BUNKER CERTIFICATE

**TRANSMONTAIGNE PRODUCT SERVICES INC.**
1670 Broadway, Suite 3100, Denver, CO 80202

Ticket No. 005402

TransMontaigne
Product
Services Inc.
Denver 303-626-8685
Fax 303-960-9015

METER #: 201-211

| DELIVERED TO: | CARIBBEAN JADE | | | |
|---|---|---|---|---|
| IMO/No. of Vessel: | 9160504 | PO NUMBER: | 0 | |
| DELIVERY METHOD: | TRUCK | ☐ BARGE ☒ TRUCK ☐ PIPELINE | | |
| CUSTOMER NAME: | PRAXIS ENERGY AGENTS LLC | | | |

DATE: 4/20/2012
PORT OF DELIVERY: MIAMI, FL
DELIVERY POINT: 128 MCARTHUR CS
LOADED FROM/VIA: 81.863
AGENT: BERMUTH
PRODUCT: RMF-180
ACCOUNT CODE: 67998

| | COMMENCED | | FINISHED | | | GROSS MEASURED BARRELS OR GALLONS | TEMP. °F | DENSITY @15°C | API GRAVITY @ 50°/F | VISCOSITY @50°/40C- | SULFUR % WT/WT |
|---|---|---|---|---|---|---|---|---|---|---|---|
| METER TICKET # or GAUGE COMPARTMENT | SCALE FEET INCHES | METER /GAUGE READING | SCALE FEET INCHES | METER /GAUGE READING | | | | | | | |
| | | | | | | 39004.00 | 124.7 | .9753 | 13.5 | 175.8 | 3.16 PPM |

| | | | SAMPLE # | 005402 | | | |
|---|---|---|---|---|---|---|---|

TOTAL GROSS BARRELS/GALLONS ... 39004.00
VCF/TEMPERATURE CONVERSION ... .9749
TOTAL NET BARRELS / GALLONS ... 38033.00
BARRELS PER METRIC TON ... 6.458
TOTAL METRIC TONS ... 140.23

|  | YES | NO | |
|---|---|---|---|
| TFS: | YES | NO | A |
| TFS#: | " " | " " | B |
| SHP: | " " | " " | C |
| MARPOL: | " " | " " | D |

NOTICE (DMA ONLY)
Dyed Diesel for Non-taxable use only.
Penalty

| | COMMENCED | | FINISHED | |
|---|---|---|---|---|
| | | A.M. | | |
| ARRIVED ALONGSIDE: | 0410 | P.M. | | |
| STARTED PUMPING: | 0440 | P.M. | 04/20/12 | |
| FINISHED PUMPING: | 1240 | P.M. | 04/20/12 | |
| DEPARTURE TIME: | 1320 | P.M. | 04/20/12 | |

VESSEL REPRESENTATIVE INVITED TO WITNESS SAMPLING ...
VESSEL REPRESENTATIVE DID WITNESS SAMPLING ...
VSL REPRESENTATIVE INVITED TO WITNESS GAUGING/METER READINGS ...
VESSEL REPRESENTATIVE/DID WITNESS GAUGING/METER READINGS ...

REPRESENTATIVE SAMPLE(S) OF DELIVERY PASSED TO SHIP'S OFFICER

I certify the above statements are true and the above soundings were received on board this
vessel. The undersigned also confirms the quantity/grade received is in accordance with the
bunkering certificate.

If applicable when delivered, in relation to the International Convention for the Prevention of
Pollution from Ships 1973/78 Consolidated Edition, 1997, the fuel oil supplied conforms
with regulation 14.1 or 14.4 and 18.3.1 of Annex VI.

Fuel sold under this agreement will be used to operate vessels in interstate or foreign commerce.
Any vessel not operating in interstate or foreign commerce will be responsible for any and all
taxes associated with the delivered bunker fuel.

SUPPLIER REPRESENTATIVE: BY

(AUTHORIZED PIC) 04/20/2012
(DATE)

ALL DEPOSITS AND/OR OUT OF THIS TRANSACTION SHALL BE INTERPRETED AND ENFORCED IN ACCORDANCE
WITH THE GENERAL MARITIME LAW OF THE UNITED STATES OF AMERICA AND ALL STATUTES RELATED THERETO.
THIS TRANSACTION IS SUBJECT TO TRANSMONTAIGNE PRODUCT SERVICES INC. GENERAL TERMS AND
CONDITIONS OF MARINE FUEL SALE, AVAILABLE UPON REQUEST OR AT THE TRANSMONTAIGNE WEBSITE.
No disclaimer stamp of any type or form will be accepted on this
bunkering certificate, nor should any such charge be applied, if it will alter,
change, or waive TransMontaigne Product Services Inc.'s Maritime Lien
against the vessel or waive the vessel's ultimate responsibility and liability
for the debt incurred through this transaction.

M/V Caribbean Jade
(Master/Vessel Officer)
(Date)

# EXHIBIT E



Worldwide Marine Oil Suppliers

263 Tresser Blvd, Suite 10-15
Stamford, CT 06901, USA
TEL: 203.357.9700  EMAIL: NEWYORK@PRAXISENERGYAGENTS.COM

## INVOICE

**BUYER:**
M/V CARIBBEAN JADE (IMO: 9160504) FLAG: ANTIGUA
AND/OR OLYMPIC CHARTERING LTD.
AND/OR MASTER AND/OR OWNER AND/OR
MANAGERS AND/OR OPERATORS
AND/OR BERNUTH AGENCIES INC.
3201 N.W. 24 STREET/RD
MIAMI, FL, UNITED STATES  33142

| | | |
|---|---|---|
| **DATE:** | 20 April 2012 |
| **INVOICE NUMBER:** | 11708 |
| **DELIVERY DATE:** | 20 April 2012 |
| **PORT OF DELIVERY:** | MIAMI |

| Product ID / Description | Quantity | Net Price / Qty | Net Value |
|---|---|---|---|
| IFO-180 (HS) (RME 180) | 140.230 MT | USD 798.00 / MT | USD 111,903.54 |
| OIL SPILL (0.08 /GBBL) | | USD 72.44 | USD 72.44 |

| | | |
|---|---|---|
| Total Item Net Value | | USD 111,975.98 |
| Total | | USD 111,975.98 |

**DUE DATE:** 14 May 2012      (CREDIT TERMS:  25 DAYS DUE NET FROM DELIVERY DATE)

AN INTEREST CHARGE OF 2% PRO RATA PER MONTH WILL BE LEVIED FOR OVERDUE PAYMENT.

PLEASE REMIT BY TELEGRAPHIC TRANSFER FREE OF ALL BANK CHARGES TO:

**Bank Details**
BENEFICIARY BANK:
TD BANK N.A.
SWIFT CODE: NRTHUS33
(WIRE ABA: 0311-0126-6)(ACH ABA: 031-201-360)
ACCOUNT # 4251625188
IN FAVOUR OF:  PRAXIS ENERGY AGENTS LLC

E & OE

# EXHIBIT F

 Worldwide Marine Oil Suppliers

**STANDARD TERMS AND CONDITIONS FOR THE SALE OF MARINE BUNKER FUELS AND LUBRICANTS**

### 1 JUNE 2002

1.00   **INTRODUCTORY**      These terms and conditions are the general standard terms and conditions under which Praxis Energy Agents L.L.C. of  New Jersey (the Company) is prepared to enter agreement (the Agreement) with another party (the Buyer) to supply to the Buyer marine bunker fuels, and/or lubricants and/or other products. These terms and conditions may be referred to as "Praxis Standard Terms and Conditions". Each Agreement will be as specifically negotiated between the Company and the Buyer as evidenced by the Company's "confirmation of stem" facsimile message or email (the Bunker Nomination) and in the event of any conflict between these terms  and conditions and the terms of the Bunker Nomination the terms of the latter shall prevail.

2.00   **DEFINITIONS**
2.01   **Agreement**  As defined in Clause 1.01
2.02   **Basic Cost**  The basic cost of Product calculated by multiplying the Unit Price by the quantity of Product delivered to the Vessel.
2.03   **Company**  Includes in addition to the Company itself, its servants, agents, assigns, sub contractors, and any and all other persons acting under the Company's instructions in fulfillment compliance or observance of this Agreement  unless the context otherwise requires.
2.04   **Bunker Nomination**  As defined in clause 1.01.  (The term facsimile also to be read as Telex throughout)
2.05   **Buyer (Purchaser)**  The party so described in the Bunker Nomination together with any agent , principal, associate , manager, partner, servant, parent, subsidiary, owner, or shareholder thereof.
2.06   **Delivery**  As defined in Clause 8.00
2.07   **Due Date**  The date specified in the Bunker Nomination for payment of the Price and all other fees, costs, charges and like items.
2.08   **Gender, Singular and Plural**  Unless the context otherwise requires, all references in the Agreement to one gender shall be deemed to include all others and references to the singular shall be deemed to include the plural vice versa.
2.09   **Physical Supplier**  The person who physically supplies the Product to the Vessel together with that person's servants, agents, successors, sub-contractors and assigns.  The Physical Supplier may be the Company or any other person.
2.10   **Port of Supply**  The port or other readily identifiable geographical location specified in the Bunker Nomination wherein or adjacent to which is the Point of Delivery.
2.11   **Point of Delivery**  The precise place at which Delivery is to be effected as provided  in the Bunker Nomination or as thereafter confirmed, advised or revised by the Company or the Physical Supplier being a berth, mooring, anchorage or other point within, adjacent to or associated with the Port of Supply.
2.12   **Price**  As defined in Clause 11.00
2.13   **Product**  The fuels, oils, lubricants, goods, items, equipment  and materials of whatever type and description as specified in the Bunker Nomination, the subject of the Agreement.
2.14   **Unit Price**  The rate of cost in United States Dollars (or such other currency specified in the Bunker Nomination) per metric tonne (or such other unit of measurement specified in the Bunker Nomination) or Product as specified in the Bunker Nomination.
2.15   **Motor Vessel** or **Vessel**  The vessel, ship or craft duly nominated to receive Product as specified in the Bunker Nomination.
2.16   **Written, in Writing and Notice**  Any requirement for written communication including the giving of any notice may be fulfilled by the use of letter-post, courier, telex, facsimile transmission or any other medium which produces a tangible result for the intended recipient.  The communication shall be deemed to have been given and received upon completion of transmission for any electrical or electronic medium, within two working days of dispatch for first class inland letter-post, within five working days of dispatch for second class inland letter-post and air mail and on the expiry of the declared or guaranteed time for delivery of any courier or monitored service.

3.00   **HEADINGS**  The use of headings and explanatory notes is for convenience and elucidation only.  They are not part of the Agreement.

4.00   **ENTIRETY AND VALIDITY**  These terms and conditions together with the Bunker Nomination constitute the entire Agreement.  No derogation, addition or amendment to the Agreement shall be of any force or effect unless and until expressly confirmed in writing by the Company.  If any provision of the Agreement shall to any extent  be invalid or unenforceable the remainder of the Agreement shall not be affected thereby.
5.00   **FORCE MAJEURE**  The Company shall not be liable for any failure to fulfil any term or condition of the Agreement if fulfilment has been delayed, hindered or prevented by any circumstances whatsoever which are not within the immediate control of the Company including but without limiting the generality of the foregoing, any strike, lockout or labour dispute or reasonable apprehension thereof, any governmental order, request or restriction, any

limitation restriction or interruption to existing or contemplated sources of supply of Product or the means of supply thereof.

**6.00    BROKERS AND AGENTS**
6.01     Unless the party with whom the Company is corresponding specifically declares to the Company prior to dispatch by the Company of the Bunker Nomination that the party with whom the Company is corresponding is not the Buyer and at the same time provides to the Company the full name and address of the Buyer then the party with whom the Company is corresponding shall be deemed to be the Buyer.
6.02     Without prejudice to the provisions of clause 6.01 in the event that the party with whom the Company is corresponding is an agent of the Buyer then the party with whom the Company is corresponding shall be jointly and severably liable with the Buyer to perform the Buyer's obligations under the Agreement notwithstanding that the party with whom the Company is corresponding purports to contract as a mere agent.
6.03     In any event the Owners and the Managers of the Vessel shall always be responsible jointly and severally with any other liable party.

**7.00    ASSINGMENT**  The Buyer shall not assign its interest in the Agreement without the prior written approval of the Company.  The Company may assign the Agreement and shall thereafter give notice thereof to the Buyer.

**8.00    DELIVERY**
8.01     **Allocation**  If the Company at any time and for any reason, believes that there may be a shortage of Product at the Port of Supply it may allocate its available and anticipated supply of Product among its Buyers in such a manner as it may in its absolute discretion determine.
8.02     **Restrictions**  The Company shall not be required to deliver Product into any of the Vessel's tanks or other places which are not regularly used for storage of bunkers or lubricants or other products as the case may be and shall not be required to deliver any Product for the export of which a Government permit is required and has not been obtained.
8.03     **Means of the Delivery**  Delivery shall be effected in one or more consignments at the Point of Delivery by such means as the Company shall deem appropriate in the circumstances.
8.04     **Barging**  In the event of delivery by barge, the Buyer shall at its own expense provide a clear and safe berth for the barge(s) alongside the Vessel's receiving lines and shall provide all necessary facilities and assistance required to effect delivery.  The Buyer agrees to pay and indemnify the Company against all claims and expenses in respect of any loss, damage or delay caused by the Vessel to any barge and/or its equipment.
8.05     **Connection**  The Buyer shall make connection between the pipelines or delivery hoses and the Vessel's intake line and shall render all other necessary assistance and provide sufficient tankage and equipment to receive promptly each and every consignment of the Delivery.  The Buyer is responsible for ensuring that Product is delivered at a safe rate and pressure and that all equipment utilised therefor is in a safe and satisfactory condition.
8.06     **Title/Retention of Ownership**  Delivery shall be deemed complete when the oil has passed the flange connecting the Physical Supplier's delivery facilities with the receiving facilities provided by the Buyer.  However, ownership of the Product  shall pass to the Buyer only after the Price has been received by the Company in full as provided in Clause 12.01.  Until such time as the Price is received in full by the Company the person in possession of the Product delivered shall hold the Product for the Company as a mere bailee.
8.07     **Risk**  The Company's responsibility for Product shall cease and the Buyer shall assume all risks and liabilities relating thereto, including loss, damage, deterioration, depreciation, contamination, evaporation or shrinkage of Product and responsibility for loss, damage and harm caused by pollution or in any other manner to third parties at the time Product leaves the Physical Supplier's fixed depot or wharf  facilities.  The Buyer agrees to indemnify without limit the Company in respect of any liability, claim or demand for which the Buyer is liable.
8.08     **Measurement**  The quantity of Product delivered hereunder shall be determined at the Physical Supplier's option by one of such generally recognised methods of measurement as is appropriate in the circumstances.
8.09     **Specification**  The Product to be delivered shall be as specified in the Bunker Nomination and other than as more precisely specified therein shall be of the Company's commercial grades of Product as currently offered generally to its Buyers at the time and the Point of Delivery for marine bunkering or lubrication purposes.  No other warranties, express or implied as to quality or fitness for any purpose, are given or form part of the Agreement.
8.10     **Compatibility and Segregation**  Responsibility for establishing compatibility  of Product delivered with any other product or products and for segregating or co-mingling the same rests solely with the Buyer.
8.11     **Substitution**  The Company may discharge its obligation to deliver Product as specified in the Bunker Nomination by supplying in substitution  thereof product of a different grade and/or  brand name provided always that such substitute product is of an equivalent or superior specification to that specified in the Bunker Nomination.
8.12     **Availability**  Subject to the availability of Product, the availability of facilities at the Port of Supply and Point of Delivery and the customary priority of  mail vessels and tankers, and to the Buyer giving notice in accordance with Clause 8.15, the Company will use its best endeavours to ensure that Product is delivered promptly upon the Vessel's arrival but the Company shall not be responsible for any loss, expense, damage or increased costs incurred in consequence  of the Vessel not being supplied promptly or otherwise being delayed or restrained for any reason whatsoever.
8.13     **Time**  The Buyer is responsible for ensuring that  the Vessel is ready to receive Product at the Point of Delivery on the expiry of the notice given in accordance with Clause 8.15.
8.14     **Delay** In the event that the Vessel's arrival at the Point of Delivery is delayed or likely to be delayed the Buyer must so advise the Company.  The Buyer should also ensure that the Vessel's agent at the Port of Supply is similarly informed and that the agent advises the  Physical Supplier accordingly.  At the Buyer's request the

Company will use its best endeavours to supply a delayed Vessel on the terms originally agreed but reserves the right to pass on to the Buyer all additional costs including increased Basic Cost arising from the Vessel's delayed arrival.

**8.15    Notice and Other Delivery Requirements**  The Buyer must give not less than 72 hours notice (excluding Sabbaths, holidays and other non-working days at the Port of Supply) of the Vessel's readiness  to receive Product to the Company and to the Physical Supplier.  Notice must be given during the Company's normal business hours (Monday to Friday inclusive, 0900-1700 Local time).  Notice given outside these hours will be deemed to have been given at 0900 on the first business day thereafter.  Furthermore it is in all circumstances and on all occasions the responsibility  and duty of the Buyer to ascertain and where appropriate to comply with:

1. the precise requirements of the Physical Supplier and any other person, body or authority in respect of the giving of notice of the Vessel's time of arrival at the Point of Delivery.
2. the exact location of the Point of Delivery
3. any particular requirements to enable Delivery to be effected as efficaciously as possible

The Buyer is advised to instruct its agent at the Port of Supply to liaise with the Physical Supplier so as to ensure compliance with these provisions.

**8.16    Information** in response to a specific request for information from the Buyer in respect of the Point of Delivery  the Company will use its best endeavours to obtain or provide the information requested.  Whilst every care will be taken to ensure that  such information is accurate and up-to-date it is  furnished on the strict understanding that It is  not a contractual representation and that no responsibility whatsoever will attach to the Company for its accuracy and veracity.

**8.17    Environmental Protection**  Without prejudice to Clause 8.07 the Company may at any time without notice take any steps which it considers necessary to protect the environment from damage arising from spillage or transport of Product.  Any action so taken shall be on behalf of and at the expense of the Buyer.

**9.00    CANCELLATION AND BREACH** In the event of the Buyer at any time cancelling a request for Product or the Vessel failing to take delivery of part or all of the requested Product the Company shall have the right to pursue a claim against both the Buyer and the Vessel for all loss and damage thereby suffered including loss of profit.  The Company may treat any other breach by the Buyer of any express term of the Agreement as a breach of a condition and it may at its discretion thereupon accept the breach, treat the Agreement as repudiated and seek such remedies as it considers appropriate.  So however that the provisions of Clauses 15.01,16.01 and 17.01 shall survive the determination of the Agreement in any event.

**10.0    LIENS** Where Product is supplied to a vessel, in addition to any other security, the Agreement is entered into and Product is supplied upon the faith and credit of the Vessel.  It is agreed and acknowledged that a maritime lien over the Vessel is thereby created for the Price of Product supplied and that the Company in agreeing to deliver Product to the Vessel does so relying upon the faith and credit of the Vessel.  The Buyer if not the owner of the Vessel hereby expressly warrants that he has the authority of the owner to pledge the Vessel's credit as aforesaid and that he has given notice of the provisions of this Clause to the owner.  The Company shall not be bound by any attempt by any person to restrict, limit or prohibit its lien or liens attaching to a Vessel.

**11.00    THE PRICE**

**11.01    Unit Price**  Where in the Bunker Nomination the Unit Price is stated to be not subject to variation the Unit Price will, subject to clause 8.14, not be varied.  In all other cases having agreed the Unit Price of the Product the Company will endeavour to refrain from making any increase.  However , the cost of marine bunkering products is volatile and the Company therefore reserves the right to increase the Unit Price at any time before delivery.  Notice of the increase will be given during the Company's normal business hours (Monday to Friday inclusive, 0900-1700 Local time).  Notice given outside these hours will be deemed to have been given at 0900 on the first business day thereafter.  In such event the Buyer may forthwith give written notice to the Company of cancellation of the Agreement.  If no notice is received within one hour of the Company advising the Buyer of the increase of the Unit Cost the Buyer shall be deemed  to have agreed to the revised Unit price and the Agreement so revised shall remain in full force and effect.

**11.02    Further Costs**  In addition to the Basic Cost  of the Product the Buyer agrees to pay for any charges raised in respect of taxes, freight, barge, vehicle, wagon or clean up costs including overtime or other like payments; insurance; pilotage; port dues  and any and all other like costs and expenses incurred by or charged to the Company.  Such charges, costs and expenses will be passed on to the Buyer at the rates charged to the Company as and when they are advised to the Company and together with the Basic Cost shall for all purposes constitute the Price due from the Buyer to the Company for the Product supplied.

The contracted prices are duty free only on the basis that the nominated vessel previous and next port of call are outside of the country; If the vessel calls an additional internal port prior to or after bunkering the prices will be adjusted substantially higher to cover the applicable duty;

**11.03    Notice of the price**  The Company will give notice of the Price to the Buyer as soon as reasonably practicable after Delivery.  In certain circumstances the Company will give notice of the Price in instalments.  Where notification of the Price is given in instalments each element of the Price so notified shall when due constitute an enforceable debt due from the Buyer to the Company.  Notice of the Price may at the Company's option be provided by invoice sent by post or telex or as otherwise provided herein or as agreed.

**11.04    Proof of delivery**  The Buyer or his representative should attend Delivery and obtain at that time all outstanding information relating to Delivery including the exact quantities and precise specification of Product

delivered.  Unless otherwise requested by the Buyer prior to despatch by the  Company of the Bunker Nomination the Company shall be under no obligation at any time to produce to the Buyer any evidence of delivery to the Vessel.  It is expressly agreed that the furnishing by the Company of proof of Delivery is not a pre-requisite to payment of the Price.

12.01  **PAYMENT**   In most cases special payment terms will have been agreed and will be set  out in the Bunker Nomination.  Each of the following terms apply unless the Bunker Nomination otherwise provides:

1. Payment of  the Price will be made in United States dollars to the bank and account specified in the Bunker Nomination in full without deduction for any reason whatsoever so as to ensure that the Company receives  value for the payment in cleared funds on or before the Due Date or such earlier date in the case of Clause 12.01.8.
2. The Due Date is as provided in the Bunker Nomination or in default the date of Delivery.
3. Timely payment is of the essence of the Agreement.
4. Late payment will attract a financial charge of 2% per calendar month on the outstanding sum calculated on a daily basis from the Due Date until receipt by the Company of sufficient cleared funds in full payment of any costs incurred, all interest and the full Price.  Partial Payments are applied firstly towards costs, secondly towards interest and thirdly towards the Price.  Accrued financial charges will be added to and become part of the outstanding sum at monthly intervals.  In the event that the contractually agreed rate of financial charge specified in the Agreement is in excess of that permitted by relevant law there shall be substituted the maximum rate so permitted.
5. Payment will be made by way of telegraphic, telex, swift or rapid electronic transfer to the bank and account  specified in the Bunker Nomination and/or Bunker Invoice.  All bank and other charges, if any, incurred in effecting remittance will be for the account of the Buyer Advice of remittance including identifying references should always be given to the Company.
6. Payments received by the Company from or on the behalf of the Buyer notwithstanding any specific request to the contrary will be applied in the following order in diminution or extinction of :
   1. accrued financial and other charges in respect of transactions for which the principal sum has been previously paid.
   2. accrued financial and other charges arising from all other transactions.
   3. any principal sum or sums due and outstanding commencing with the oldest and proceeding chronologically thereafter to the most recent.
   4. any principal sum which the Company knows or reasonably expects will fall due at a future date.
7. The Company may in good faith vary, amend, withdraw, substitute or add to the terms relating to payment at any time in the course of a transaction in such manner as it shall in its absolute discretion consider necessary to protect its interests.
8. If at any time the reputation, standing, creditworthiness, liquidity or solvency of the Buyer or any principal manager, subsidiary , parent, associate or affiliate thereof should give the Company reasonable cause for concern, the Company may without prejudice to all other rights and remedies which it may have give notice to the Buyer that credit facilities from the Company to the Buyer are withdrawn or suspended as the case may be and all sums outstanding shall thereupon fall due for immediate payment irrespective of any other Due Date previously agreed. Default interest shall incur from the date of the relevant notice being tendered to the Buyer.
9. In the event that the Buyer or any subsidiary or parent thereof shall commit an act of bankruptcy or shall be the subject of proceedings judicial or otherwise commenced for debt, bankruptcy, insolvency, liquidation or winding up the Company may forthwith terminate any Agreement with the Buyer and/or all credit arrangements in the lines of the Clause 12.01.8 above.
10. The full legal and other costs and expenses incurred by the Company including those of the Company's own legal department and of other lawyers it may employ in connection with any breach by the Buyer of any term of the Agreement including but not limited to actions for security or enforcement as well as preaction costs shall be for the Buyer's account, payable by the Buyer and shall for all purposes form part of the Price due from the Buyer to the Company for Product supplied.

13.00  **CLAIMS, DISPUTES AND PRECAUTIONS**
13.01  **Time Limits:** Because the Company is frequently placed under strict time limits by its suppliers for the presentation of claims it is necessary that it too must impose rigid time limits on receiving notice of claims from its Buyers.  In consequence of the Company's strict time limits, Buyers should ensure that they maintain their own equally strict internal checking and reporting procedures.  It must be clearly understood that the Company will not relax its time-limits in any circumstances.
13.02  **Notification:** Written notice of any claim or potential claim must be given to the Company within the time limit specified.  It is the Buyer's responsibility to ensure that notice is received by the Company whose confirmation of receipt should always be sought.  Regardless of whether a claim or dispute has arisen or is anticipated the Buyer must always give prompt notice to the Company of any discrepancy, error or omission present in any form or document tendered, submitted or produced by the Physical Supplier and of any unusual occurrence relating to the Delivery.
13.03  **Sufficiency of Information:**    To enable the Company to investigate and pursue a claim the notice must be give sufficient information for the Company to be able to identify the relevant transaction , the nature of the complaint and the loss or damage alleged.  Any notice which does not give such sufficient information will not be

valid.  For the same reasons the Buyer must provide a full and complete response to any and all questions, enquiries and requests made of it by the Company concerning the claim and matters relating thereto.

13.04  **Categories:**    Claims fall into 3 categories:
  1. Quantity claims and disputes
  2. Quality claims and disputes
  3. Other claims and disputes

1.01    **Quantity Claims and Disputes:** These are most easily avoided by ensuring high standards of checking before, during and after Delivery by an Officer of the Vessel's crew or other senior representative of the Buyer.

1.02    For bulk deliveries delivery barges, wagons and vehicles must be checked by tank-dipping to measure the contents and ensure full out-turn.  Flow meters must be checked for seals, correct settings and calibration and general condition.  All of these checks must be carried out before and after delivery of each consignment and each barge, wagon or vehicle tank load.  The Delivery must be supervised at all times and care must be taken in ensuring that all documentation is complete and accurate before signing and stamping.  Any discrepancies must be recorded on the Physical Supplier's delivery receipt.  Unless these procedures are followed it is nearly always impossible for a claim to be substantiated.  The Company regrets therefore that it will be obliged to reject claims for short delivery where these receiving procedures are not followed.

1.03    The Company will not accept a claim for short delivery based upon figures obtained by measuring Product in the Vessel's tank.

1.04    The time limit for receipt by the Company of notice of a quantity dispute is 7 (seven) days from the date of Delivery or such shorter period as is specified in the Bunker Nomination.

2.01    **Quality Claims and Disputes.** It is the Buyer's responsibility to ensure that the products tendered for Delivery are those which are required by the Vessel and are delivered into the correct tanks.

2.02    Two representative samples of every consignment  and load of the Delivery must be taken as Delivery proceeds.  The samples must be signed and sealed by a representative of the Physical Supplier and by an officer of the Vessel or other senior representative of the Buyer.  One set samples must be retained by the Buyer, the other by the Physical Supplier.

2.03    As with quantity claims it is important to check that all documentation is in order and to note discrepancies on the Physical Supplier's delivery receipt before signing and stamping.

2.04    In the event of the Buyer having grounds to believe that the Product supplied does not accord  ith the relevant description in the Bunker Nomination or is defective the Buyer shall immediately:
  1. take all reasonable steps to mitigate the consequences of having been supplied with possibly defective or incorrect Product.
  2. give notice with full details of the possibly defective or incorrect Product to the Company together with the Vessel's position destination and ETA; the quantities and locations of all bunkers on board the vessel, the rate and quantity of consumption since Delivery and the location immediately prior to consumption of bunkers consumed; for each of the three proceeding deliveries to the vessel, the quantity, quality and specification of Product supplied, the port and date of supply and the name of the supplier;
  3. inform the Company of the whereabouts of the Buyer's set of samples.

2.05    It is a pre-condition of the Company being prepared to consider any quality claim and of the Company being liable therefore, that at the time notice is given, the Buyer has retained its complete set of sealed samples and is prepared to and has them analysed by a reputable independent testing laboratory, approved in writing by the Company, in accordance with established procedures and in the presence of a representative of the Company.  In the event that the Buyer is unable or unwilling to produce its samples for analysis within 28 days of a request from the Company so to do the Company may proceed to have the Physical Supplier's samples analysed and the results of such analysis shall be binding upon the parties hereto.  However, if the analysis of any other samples is expressly agreed between the parties, the results thereof shall be those binding.

2.06    If it is alleged that any equipment or machinery has been damaged by defective Product full details must be given  to the Company at the earliest opportunity and the item must be preserved and made available for inspection on demand at any reasonable time or times to the Company or its representative.

2.07    The time limit for receipt by the Company of notice of a quality claim is 7(seven) days from the date of Delivery or such shorter period as is specified in the Bunker Nomination.

3.01    **Other Claims and Disputes:** Notice of all other claims, specifically excluding any and all claims relating to or associated with those relating to matters of quantity or quality which are subject to the time limits set out in sub-clauses 13.04.1 and 13.04.2 above, should be given to the Company as soon as reasonably possible and in any event  no later than 28 days after Delivery.  If the Bunker Nomination provides for a shorter period such shorter period shall apply.

4.01    **Summary of Time Limits:**
  Quantity claims and disputes 7 days
  Quality claims and disputes  7 days
  Other claims and disputes  28 days
all subject to the provision of shorter time limits in the Bunker Nomination.

14.00  **WAIVER**  The failure by any party to the Agreement to enforce any right against any other party shall not be construed as a waiver of that right or in any way affect the validity of the Agreement.  In particular, the granting

by the Company of any additional time to make payment or the waiving or reducing of any financial or other charge shall not prevent the Company at any time thereafter from relying upon its strict contractual rights.

15.00   **INDEMNITY**   The Buyer hereby indemnifies the Company in respect of all damage or injury occurring to any person or to any property and against all actions, suits, claims, demands, costs, charges or expenses arising in connection therewith to the extent that the same shall have been occasioned by the negligence or default of the Buyer, his servants or agents or any third party in the course of  performance of or arising out of the Agreement.

16.00   **LIABILITY**   To the extent permitted by Law the Company shall not be liable to the Buyer for any loss or damage including loss of profit or any other consequential loss whatsoever arising from any cause whatsoever whether in contract, tort or otherwise including the negligence of the Company, its servants, agents or sub-contractors.

17.00   **COMPENSATION**  Notwithstanding  the foregoing, in the event that the Company is found to be liable to the Buyer , the total amount payable by way of compensation other than in respect of personal injury or death shall not exceed the price charged to the Buyer for Product supplied under the Agreement.  It is a pre-condition to the payment of any compensation by the Company that all sums standing due to the Company from the Buyer are first paid and settled.

18.00   **INSURANCE**  The Buyer is responsible for effecting and maintaining in force adequate insurances  which will fully protect the Buyer, the Company and all third parties from all risks, hazards and perils associated with or arising from the Agreement and Delivery.

19.00   **LICENCES PERMITS AND APROVALS**   The Buyer is responsible for obtaining all necessary permits, licences and approvals required to enable both parties to execute all of their obligations under the Agreement.

20.00   **NO WARRANTY**
20.01   The Product shall be within the specifications generally offered to the Company's customers at the time and place of delivery.
20.02   The Company makes no warranties of quality (other than what is expressly mentioned herein above) fitness or merchantability with respect to any of the Products and any implied warranties or conditions of whatsoever nature  (statutory included) are expressly excluded.
20.03   The Buyer shall have the sole responsibility to select suitable products for his vessel.

21.00   **APPLICABLE LAW**  The Law governing any and all disputes and all other matters/issues between the Company and the Buyer and/or the Vessel shall be the U.S.A. Law. Such Law shall also govern, but without limitation, all issues concerning the enforcement and the application and status of maritime liens.